SEYFARTH SHAW LLP
Phillip J. Ebsworth (SBN 311026)
pebsworth@seyfarth.com
Kyle W. Owen (SBN 326335)
kowen@seyfarth.com
400 Capitol Mall, Suite 2300
Sacramento, California 95814-4428
Telephone: (916) 448-0159
Facsimile: (916) 558-4839

Attorneys for Defendants
UPS SUPPLY CHAIN SOLUTIONS, INC, and
UPS CARTAGE SERVICES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND DELUIS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UPS SUPPLY CHAIN SOLUTIONS, INC., a Delaware corporation; UPS CARTAGE SERVICES, INC., a Georgia corporation; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 2:26-cv-09164<br><br>**CLASS ACTION**<br><br>**DEFENDANTS' NOTICE OF REMOVAL**<br><br>[Los Angeles County Superior Court Case No. 26STCV22122]<br><br>Complaint Filed: July 14, 2026<br>Trial Date: None Set |

**TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND TO PLAINTIFF RAYMOND DELUIS AND HIS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants UPS Supply Chain Solutions, Inc., and UPS Cartage Services, Inc. file this Notice of Removal on the grounds that the above-captioned Court has federal jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), pursuant to 28 U.S.C. §§ 1332(c), 1332(d)(2), 1441(a), 1446, and 1453. The Notice of Removal is intended to remove the above-captioned action, which was originally commenced in the Superior Court of the State of California for the County of Los Angeles, to the United States District Court for the Central District of California.

## I. BACKGROUND

1. On July 14, 2026, Plaintiff Raymond Deluis ("Plaintiff") filed a Class Action Complaint in the Superior Court of State of California for the County of Los Angeles, entitled *RAYMOND DELUIS, on behalf of himself and all others similarly situated, v. UPS SUPPLY CHAIN SOLUTIONS, INC., a Delaware corporation; UPS CARTAGE SERVICES, INC. a Georgia corporation; and DOES 1 through 50, inclusive*, Case No. 26STCV22122 ("Complaint"). The Complaint asserts the following six causes of action: (1) unfair competition (Bus. & Prof. Code § 17200, *et seq.*); (2) non-provision of meal and rest periods (Lab. Code § 226.7); (3) unpaid minimum and overtime wages (Lab. Code § 1194); (4) failure to indemnify business expenses (Lab. Code § 2802); (5) wage statement penalties (Lab. Code § 226); and (6) waiting time penalties (Lab. Code § 203). (*See* Exhibit A (Complaint).)

2. On July 17, 2026, Defendant UPS Supply Chain Solutions, Inc.'s registered agent for service in California received, via process server, a packet containing the Summons; Complaint; Civil Case Cover Sheet; Alternative Dispute Resolution Information Package; and Guidelines for Complex Civil Departments. A true and correct copy of the service packet is attached as **Exhibit A**.

3. Before filing this Notice of Removal, Defendants have not filed or received any other pleadings or papers in this action, other than the pleadings in **Exhibit A**.

## II. TIMELINESS OF REMOVAL

4. Notice of removal is timely if it is filed within 30 days after the service of the complaint or summons. 28 U.S.C. §1446(b)(1) ("The notice of removal . . . shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant . . . .").

5. Service of process that triggers the 30-day period to remove is governed by state law. *Whidbee v. Pierce Cty.*, 857 F.3d 1019, 1023 (9th Cir. 2017) ("When a case is removed from state court to federal court, the question whether service of process was sufficient prior to removal is governed by state law.").

6. Defendants' Notice of Removal is timely, because it is filed on August 17, 2026, which is within 30 days of service on Defendant UPS Supply Chain Solutions, Inc. of the Summons and Complaint on July 17, 2026. 28 U.S.C. § 1446(b); Cal. Code Civ. Proc. § 415.10 ("A summons may be served by personal delivery of a copy of the summons and of the complaint to the person to be served. Service of a summons in this manner is deemed complete at the time of such delivery."); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) ("[W]e hold that a named defendant's time to remove is triggered by simultaneous service of the summons and complaint . . . .").

## III. REMOVAL UNDER THE CLASS ACTION FAIRNESS ACT

7. Under the CAFA, district courts have original jurisdiction for class actions "if [1] the class has more than 100 members, [2] the parties are minimally diverse, and [3] the amount in controversy exceeds $5 million." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S. Ct. 547, 552 (2014) (citing 28 U.S.C. § 1332(d)(2), (5)(B)). As set

forth below, each of these three requirements are met and, thus, this action is properly removable under 28 U.S.C. § 1441(a).

**A. The Class Action Includes Over 100 Putative Class Members**

8. Removal under CAFA requires at least 100 members in a proposed class. *See* 28 U.S.C. § 1332(d)(5)(B) (providing that CAFA jurisdiction does not apply to any class action in which "the number of members of all proposed plaintiff classes in the aggregate is less than 100").

9. Plaintiff asserts claims on behalf of all current and former hourly, non-exempt employees that worked for Defendants in California from four years before the filing of the Complaint to the date of final judgment. (Exhibit A, Compl. ¶ 19.) The proposed class period is thus July 14, 2022, to the present.

10. From July 14, 2022, to the present, Defendant UPS Supply Chain Solutions, Inc. employed approximately 818 current and former non-exempt employees in the class. Thus the size of the proposed class far exceeds the minimum threshold of 100 potential class members under CAFA.

**B. Plaintiff And Defendants Are Minimally Diverse**

11. CAFA requires only minimal diversity to establish federal jurisdiction. This means at least one purported class member must be a citizen of a state different from any named defendant. 28 U.S.C. § 1332(d)(2)(A).

12. A party's citizenship is determined at the time the lawsuit was filed. *See In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1236 (9th Cir. 2008) ("[T]he jurisdiction of the court depends upon the state of things at the time of the action [was] brought.").

**1. Plaintiff Is A Citizen Of California**

13. For diversity purposes, a natural person's state of citizenship is determined by that person's domicile—*i.e.*, "[one's] permanent home, where [that person] resides with the intention to remain or to which [that person] intends to return." *Kantor v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001); *see Armstrong v. Church of*

*Scientology Int'l*, 243 F.3d 546, 546 (9th Cir. 2000) ("For purposes of diversity jurisdiction, an individual is a citizen of his or her state of domicile, which is determined at the time the lawsuit is filed").

14. Plaintiff alleges that he "is an individual who, at relevant times, has been employed by Defendants in the City of Inglewood, County of Los Angeles, California . . . from March 2007 to the present."

15. Plaintiff's intent to remain domiciled in California also is evident from the fact that he brought this lawsuit against Defendants in the Superior Court of the State of California for the County of Los Angeles. Therefore, Plaintiff was at all relevant times, and still is, a citizen and resident of the State of California. (Compl. ¶ 6.) This comports with Defendants' business records associated with Plaintiff's employment which list California as Plaintiff's state of residence. This is the state that Plaintiff listed when applying for employment, and the state that Plaintiff maintained on file with Defendants throughout his employment. Plaintiff maintained a California address on file for purposes of his personnel file, payroll checks, state payroll, and tax withholdings. Plaintiff's last known home address with Defendants is in California. Plaintiff filed this lawsuit in California, and he seeks to represent a class of current and former California employees. (*Id.* ¶ 19.)

16. Accordingly, Plaintiff is, and at all times relevant to this action has been, a citizen of the State of California for the purposes of diversity.

**2. Defendants Are Not Citizens Of California**

17. Defendants are, and were at all relevant times, citizens of a state other than California within the meaning of 28 U.S.C. § 1332(c)(1).

18. The United States Supreme Court held that, when determining a business entity's principal place of business for diversity purposes, the appropriate test is the "nerve center" test. *Hertz Corp. v. Friend*, 559 U.S. 77, 80–81, 92–93 (2010). Under the "nerve center" test, the "principal place of business" means the headquarters where a business entity's high-level officers direct, control, and coordinate its activities on a day-

to-day basis. *See id*. at 92–93 ("We conclude that 'principal place of business' is best read as referring to the place where a [business entity's] officers direct, control, and coordinate th[at entity's] activities"); *see also Industrial Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092–93 (9th Cir. 1990) (holding that the "nerve center" is where "its executive and administrative functions are performed").

19. Defendant UPS Supply Chain Solutions, Inc. ("UPS SCS") is incorporated in the state of Delaware, as alleged (Compl. ¶ 8), and its principal place of business is and has been located in the State of Georgia. UPS SCS's principal place of business is in Georgia because its "nerve center" is located in Georgia. Its corporate headquarters are located exclusively in the state of Georgia, and its executive and administrative functions take place in Georgia. Thus, for the purpose of diversity jurisdiction, UPS SCS is a citizen of Delaware and Georgia.

20. Moreover, Defendant UPS Cartage Services, Inc. ("UPS Cartage") is incorporated in George, as alleged (*id.* ¶ 9), and its principal place of business is and has been located in the state of Ohio. UPS Cartage's principal place of business is in Ohio because its "nerve center" is located in Ohio. Its corporate headquarters are located in Ohio, and its executive and administrative functions take place in Ohio. Thus, for purposes of diversity jurisdiction, UPS Cartage is a citizen of Georgia and Ohio.

21. Therefore, for purposes of diversity of citizenship, Defendants are, and at all relevant times have been, citizens of the State of Delaware, State of Georgia, and the State of Ohio under 28 U.S.C. § 1332(c)(1).

22. And because Plaintiff is a citizen of California and Defendants are not, minimal diversity exists for purposes of CAFA.

### 3. The Citizenship Of Doe Defendants Should Be Disregarded

23. The other defendants named in the Complaint are merely fictitious parties identified as "Does 1 through 50" whose citizenship is disregarded for purposes of this removal. 28 U.S.C. § 1441(b) (for purposes of removal, "the citizenship of defendants sued under fictitious names shall be disregarded"); *see Soliman v. Philip Morris, Inc.*,

311 F.3d 966, 971 (9th Cir. 2002) ("citizenship of fictitious defendants is disregarded for removal purposes and becomes relevant only if and when the plaintiff seeks leave to substitute a named defendant"); *Fristoe v. Reynolds Metals Co.*, 615 F.2d 1209, 1213 (9th Cir. 1980) (unnamed defendants are not required to join in a removal petition).

24. The inclusion of "DOES 1 through 50" in the Complaint does not deprive this Court of jurisdiction.

**C. The Amount In Controversy Exceeds CAFA's $5 Million Threshold**

25. CAFA requires that the amount in controversy exceed $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2). Under CAFA, the claims of the individual members in a class action are aggregated to determine if the amount in controversy exceeds the sum or value of $5,000,000. 28 U.S.C. § 1332(d)(6).

26. Congress intended for federal jurisdiction to be appropriate under CAFA "if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (*e.g.*, damages, injunctive relief, or declaratory relief)." Senate Judiciary Committee Report, S. Rep. No. 109-14, at 42 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 40.

27. The Ninth Circuit and federal courts in California have found that any doubts over the amount in controversy in a CAFA action should be resolved in favor of federal jurisdiction. *See, e.g.*, *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1116 (9th Cir. 2015) ("'CAFA's language favors federal jurisdiction over class actions.'") (quoting *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006) ("CAFA's language favors federal jurisdiction over class actions and CAFA's legislative history suggests that Congress intended . . . all doubts [be] resolved 'in favor of exercising jurisdiction over the case.'")); *Mesa v. Enloe Med. Ctr.*, 2021 WL 1187274, at *2 (E.D. Cal. Mar. 30, 2021) (noting that "CAFA . . . favor[s] federal jurisdiction"); *Clark v. WorldMark, The Club*, 2019 WL 1023887, at *6 (E.D. Cal. Mar. 4, 2019) (same).

28. Likewise, the Senate Judiciary Committee's Report on the final version of CAFA also makes clear that any doubts regarding the maintenance of interstate class

actions in state or federal court should be resolved in favor of federal jurisdiction. *Id.* at 42–43 ("if a federal court is uncertain about whether 'all matters in controversy' in a purposed class action 'do not in the aggregate exceed the sum or value of $5,000,000, the court should err in favor of exercising jurisdiction over the case . . . . Overall, new section 1332(d) is intended to expand substantially federal court jurisdiction over class actions. Its provision should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.").

29. Here, even if the Complaint does not allege an amount in controversy, the removing defendant only needs to prove by a preponderance of the evidence that the amount in controversy exceeds that minimum. *See, e.g., Elizabeth Perez v. Rose Hills Company*, 131 F.4th 804, 807 (9th Cir. 2025) ("If the allegation is disputed, then the party seeking removal—and invoking the jurisdiction of the federal courts—bears the burden of demonstrating by a preponderance of the evidence that the amount in controversy exceeds $5 million.") (emphasis added); *Ramos v. MOOG Inc.*, 2020 WL 969023, at *3 (C.D. Cal. Feb. 27, 2020) (applying preponderance of evidence standard to deny motion to remand where plaintiff's class action complaint makes conclusory allegation that the "aggregate claim is under five million dollars"); *see also Dart*, 135 S. Ct. at 553–54 ("Removal is proper on the basis of an amount in controversy asserted by the defendant if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional threshold") (emphasis added, internal alterations omitted); *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 981 (9th Cir. 2013) ("A defendant seeking removal of a putative class action must demonstrate, by a preponderance of evidence, that the aggregate amount in controversy exceeds the jurisdictional minimum.") (emphasis added); *accord Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) ("Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged. In light of

*Standard Fire*, this rule is not altered even if plaintiffs affirmatively contend in their complaint that damages do not exceed $5 million.") (citations omitted); *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (holding that under the "preponderance of the evidence" standard, "the defendant must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds that amount"); *Schiller v. David's Bridal, Inc.*, 2010 WL 2793650, at *2 (E.D. Cal. July 14, 2010) (same).

30. To satisfy this standard, "defendants' notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart*, 135 S. Ct. at 554 (emphasis added); *see Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) ("Because some remnants of our former antiremoval presumption seem to persist, we reaffirm three principles that apply in CAFA removal cases. First, a removing defendant's notice of removal 'need not contain evidentiary submissions' but only plausible allegations of the jurisdictional elements"; "An assertion that the amount in controversy exceeds the jurisdictional threshold is not defeated merely because it is equally possible that damages might be 'less than the requisite . . . amount'").

31. To establish the jurisdiction threshold, "a defendant is not 'required to comb through its records to identify and calculate the exact frequency of violations.'" *Serrieh v. Jill Acquisition LLC*, 707 F. Supp. 3d 968, 974–75 (E.D. Cal. 2023) (denying motion to remand under CAFA) (quoting *Lopez v. Aerotek, Inc.*, 2015 WL 2342558, at *3 (C.D. Cal. May 14, 2015)); *see also Korn v. Polo Ralph Lauren Corp.*, 536 F. Supp. 2d 1199, 1204-1205 (E.D. Cal. 2008) (internal quotations omitted) (concluding that the burden of establishing the jurisdictional threshold "is not daunting, as courts recognize that under this standard, a removing defendant is not obligated to research, state, and prove the plaintiff's claims for damages."); *see also Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1117 (9th Cir. 2004) ("the parties need not predict the trier of fact's eventual award with one hundred percent accuracy"); *Torrez v. Freedom Mortg., Corp.*, 2017 WL 2713400, at

*4 (C.D. Cal. June 22, 2017) ("[A] defendant is 'not required to comb through the records to identify and calculate the exact frequency of violations.'") (quoting *Salcido v. Evolution Fresh, Inc.*, 2016 WL 79381, at *6 (C.D. Cal. Jan. 6, 2016)); *Oda v. Gucci Am., Inc.*, 2015 WL 93335, at *5 (C.D. Cal. Jan. 7, 2015) ("Gucci is not required to comb through its records to identify and calculate the exact frequency of violations. Rather, Gucci is only required to prove the amount in controversy by a preponderance. Where, as here, a plaintiff makes generalized allegations regarding the frequency of violations, a defendant may calculate the amount in controversy based on reasonable assumptions."); *Avila v. Rue21, Inc.*, 432 F. Supp. 3d 1175, 1186 (E.D. Cal. 2020) (denying motion to remand and rejecting plaintiffs argument that "a declaration alone, . . . is *per se* insufficient to establish the amount in controversy because it lacks foundation and corroborating documents such as payroll records").

32. As the Ninth Circuit recently explained, this is "[b]ecause '[t]he amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability,' a removing defendant need not present evidence of what its ultimate liability will be—in many cases, the defendant presumably expects that figure to be zero." *Perez*, 131 F.4th at 807 (quoting *Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010).

33. The Ninth Circuit has explained that a removing defendant may rely on the allegations in the Complaint and "'a chain of reasoning that includes assumptions' to calculate the amount in controversy." For purposes of ascertaining the amount in controversy, "the court must accept as true plaintiff's allegations as pled in the Complaint and assume that plaintiff will prove liability and recover the damages alleged." *Muniz v. Pilot Travel Ctrs. LLC*, 2007 WL 1302504, *3 (E.D. Cal. May 1, 2007) (denying motion for remand of a class action for claims under the California Labor Code for missed meal and rest periods, unpaid wages and overtime, inaccurate wage statements, and waiting-time penalties).

34. If a plaintiff asserts statutory violations, the court must assume that the violation rate is 100%, unless the plaintiff specifically alleges otherwise:

> As these allegations reveal, plaintiff includes no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%, used by defendant in its calculations. Plaintiff is the "master of [her] claim[s]," and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought. She did not.

*Muniz*, 2007 WL 1302504, at *4 (citing *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)); *see also Wheatley v. MasterBrand Cabinets*, 2019 WL 688209, at *5 (C.D. Cal. Feb. 19, 2019) ("Defendant and the Court must rely on assumptions regarding the rate of the alleged violations . . . . Plaintiff does not allege that some putative class members were subject to distinct policies. The Court therefore finds the assumption that uniform . . . policies were applied to all putative class members reasonable.") (emphasis added); *Soratorio v. Tesoro Ref. and Mktg. Co., LLC*, 2017 WL 1520416, at *3 (C.D. Cal. Apr. 26, 2017) ("Plaintiff's Complaint could be reasonably read to allege a 100% violation rate. The Complaint notes that Defendants 'did not provide' Plaintiff and the other class members 'a thirty minute meal period . . . ,' and that this was Defendant's 'common practice.' It also alleges that Defendants had a . . . 'common practice' of failing to provide required breaks."); *Arreola v. The Finish Line*, 2014 WL 6982571, *4 (N.D. Cal. Dec. 9, 2014) ("District courts in the Ninth Circuit have permitted a defendant removing an action under CAFA to make assumptions when calculating the amount in controversy—such as assuming a 100 percent violation rate, or assuming that each member of the class will have experienced some type of violation—when those assumptions are reasonable in light of the allegations in the complaint."); *Coleman v. Estes Express Lines, Inc.*, 730 F. Supp. 2d 1141, 1149 (C.D. Cal. 2010), *aff'd sub nom. Coleman v. Estes Exp. Lines, Inc.*, 631 F.3d 1010 (9th Cir. 2011) ("[C]ourts have assumed a 100% violation rate in calculating the amount in controversy when the complaint does not allege a more precise calculation").

35. Numerous other district courts have similarly concluded that alleging a policy of noncompliance in a complaint justifies the assumption of a 100 percent violation rate. *See, e.g., Franke v. Anderson Merchandisers LLC*, 2017 WL 3224656, at *2 (C.D. Cal. July 28, 2017) ("Courts in this Circuit have generally found the amount in controversy satisfied where a defendant assumes a 100% violation rate based on allegations of a 'uniform' illegal practice—or other similar language—and where the plaintiff offers no evidence rebutting this violation rate"); *Torrez v. Freedom Mortg., Corp.*, 2017 WL 2713400, at *3-5 (C.D. Cal. June 22, 2017) (where complaint alleged "FMC engaged in a pattern and practice of wage abuse against its hourly-paid or non-exempt employees within the state of California," the complaint "can reasonably be interpreted to imply nearly 100% violation rates"); *Feao v. UFP Riverside, LLC*, 2017 WL 2836207, at *5 (C.D. Cal. June 26, 2017) ("Plaintiff's allegations contain no qualifying words such as 'often' or 'sometimes' to suggest less than uniform violation that would preclude a 100 percent violation rate."); *Soratorio, LLC*, 2017 WL 1520416, at *3 ("Plaintiff's Complaint could be reasonably read to allege a 100% violation rate. The Complaint notes that Defendants 'did not provide' Plaintiff and the other class members 'a thirty minute meal period for every five hours worked,' and that this was Defendants' 'common practice.' It also alleges that Defendants had a practice of 'requiring employees to work for four hours and more without a rest period' and that Defendants had a 'common practice' of failing to provide required breaks."); *Ritenour v. Carrington Mortg. Servs. LLC*, 228 F. Supp. 3d. 1025, 1030 (C.D. Cal. 2017) ("Given the vague language of the Complaint and the broad definition of the class, it is reasonable for Defendants to assume a 100% violation rate—especially since Plaintiffs offer no alternative rate to challenge Defendant's calculations."); *Jones v. Tween Brands, Inc.*, 2014 WL 1607636, at *3 (C.D. Cal. Apr. 22, 2014) (using 100 percent violation rate for waiting-time penalties since the complaint did not limit the number or frequency of violations).

36. Plaintiff seeks to recover, on behalf of himself and the alleged class, unpaid wages and penalties for Defendants' alleged failure to pay minimum and overtime wages, failure to provide meal and rest breaks, failure to timely pay wages at the end of employment, unreimbursed business expenses, and unfair business practices. Plaintiff also seeks to recover attorneys' fees and costs. (*See* Compl., Prayer for Relief.)

37. As set forth below, even based on conservative calculations and assumptions despite Plaintiff's wide-ranging allegations, the amount in controversy well exceeds the $5 million threshold.

38. All calculations supporting the amount in controversy are based directly on the Complaint's allegations, assuming, without any admission of the truth of the facts alleged and solely for purposes of this Notice of Removal, that liability is established.

**1. Non-Compliant Meal and Rest Periods Claim (Second Cause of Action)**

39. Plaintiff contends that Defendants failed to provide him and the putative class members "with timely, duty-free meal and rest periods or to pay premium wages when those periods were not provided[.]" (Compl. ¶ 1.) Plaintiff also alleges, among other things, that Defendants had a "policy and/or practice" of failing to provide him and the putative class members with "reasonable opportunities to take timely meal and rest periods based on the nature and volume of their work coupled with staffing levels," "adjusting time records . . . to reflect timely meal periods that they did not actually take," and instructing [them] to clock out for timely meal periods and allowing them to continue working." (Compl. ¶ 34(a)–(g).)

40. Taking Plaintiff's allegations as true, it is reasonable to assume that based on Defendants' alleged "common policy and/or practice," each potential class member would have suffered a meal period violation and a rest period violation each shift of each workweek. Courts regularly approve the use of a 100% violation rate based on based on wide-ranging allegations of "company-wide practices and/or policies" like the ones Plaintiff asserts here. *See, e.g.*, *Andrade v. Beacon Sales Acquisition, Inc.*, 2019 WL

4855997, at *3-4 (C.D. Cal. Oct. 1, 2019) (holding that allegations that defendants committed wage violations "as [a] matter[ ] of policy and/or practice" justified assumption of maximum violation rate and wages owed when calculating AIC based on "two improperly withheld meal periods and two improperly withheld rest periods per workweek") (emphasis added); *Elizarraz v. United Rentals, Inc.*, 2019 WL 1553664, at *3 (C.D. Cal. Apr. 9, 2019) ("denying motion to remand; "[n]umerous courts have found a 100% violation rate reasonable (i.e., missed meal period and missed rest period every day)").

41. But even when a plaintiff limits the frequency of violations (which is not the case here), courts still find reasonable assumptions of higher violation rates. *See, e.g.*, *Thompson*, 2022 WL 4109450, at *5 (denying motion to remand and granting defendant's motion to dismiss; "Courts have upheld 100% violation rate calculations even where the plaintiff explicitly pleads otherwise. For instance, where, as here, plaintiffs have pled violations "from time to time," in *Muniz v. Pilot Travel Centers LLC*, [2007 WL 1302504 (E.D. Cal. May 1, 2007),] the court upheld a 100% violation rate calculation when the plaintiffs stated in their complaint that they 'were not always provided lawful meal periods.' More generally, courts have upheld greater labor law violation rates than are alleged by the plaintiffs."); *Ramirez v. Cornerstone Bldg. Brands*, 2022 WL 1556664, at *1 (E.D. Cal. May 17, 2022) ("The fact that the Williams['] Complaint also indicates that the violations occurred 'from time to time' or 'often' does not detract from its repeated references to 'company-wide policies and procedures' that violated California labor laws.").

42. During the proposed class period—July 14, 2022, to the present—the total number of workweeks worked by the putative class members for Defendant UPS SCS was approximately 112,082. Plaintiff included no limitation on the number of violations. He instead alleges that Defendants failed to provide meal periods in compliance with the Labor Code, i.e., no proper, uninterrupted meal periods were given to employees who worked more than five hours (*see* Labor Code § 512). But even based on a conservative

estimate that each putative class member only experienced a non-compliant meal period once each workweek (i.e. a violation rate of just 20%) and was entitled to a corresponding meal period premium at the average hourly rate ($22.31) for each purported violation, the putative class meal period damages are approximately **$2,500,549.42** [$22.31 per hour x 1 violations x 112,082 workweeks].

43. And because Plaintiff makes the same sweeping allegations of non-complaint rest period policies and practices (*see* Compl. ¶¶ 1, 34(a)–(g)), it is reasonable and conservative to also assume that each putative class member experienced at least one rest period violation per workweek and is owed a corresponding premium payment of $22.31 (average hourly rate). Thus the approximate damages across the putative class for alleged rest period violations is also **$2,500,549.42** [$22.31 per hour x 1 violations x 112,082 workweeks].

44. Thus, based on these reasonable and conservative estimates, the total value of Plaintiff's claim for meal and rest period violations is **$5,001,098.84**. This claim alone surpasses CAFA's jurisdictional threshold.

### 2. Unpaid Minimum and Overtime Wages Claim (Third Cause of Action)

45. Plaintiff's third cause of action seeks to recover unpaid minimum and overtime wages, along with liquidated damages equal to those amounts. (Compl. ¶¶ 41–42.) More specifically, Plaintiff alleges that during the class period Defendants had in place a "policy and/or practice" of not "paying minimum and overtime wages to Plaintiff and Plaintiff Class members as a result of their overtime and meal period policies and practices." (Compl. ¶ 34(f).)

46. These allegations constitute a general pattern or practice of violating minimum wage and overtime requirements. *See, e.g., Garza Jr. v. WinCo Holding, Inc.*, 2022 WL 902782, at *5 (E.D. Cal. Mar. 28, 2022) ("Garza alleges WinCo employed a policy of rounding employees' hours that resulted in a miscalculation of total overtime hours worked. This constitutes a general pattern or practice of labor violations.")

(emphasis added); *Muniz v. Pilot Travel Centers LLC*, 2007 WL 1302504, at *4 (E.D. Cal. May 1, 2007) (concluding that a "100%" violation rate was reasonable because "plaintiff include[d] no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%" based on allegations that defendant had a "common course of conduct in violation of the law" and that "plaintiff and class members 'were not always paid all wages and overtime" and "were 'not always provided lawful meal periods . .. . [and] rest periods").

47. Defendants deny these sweeping and unmeasured allegations. Nonetheless, assuming just one hour of unpaid overtime per week is more than reasonable based on Plaintiff's allegations. *See, e.g., Serrieh*, 707 F. Supp. 3d at 978 ("The court finds defendant's estimate of one hour per week to be reasonable . . . .'[A] 20% violation rate (one unpaid overtime hour per week' is 'a reasonable and a conservative estimate'"); *Gant v. ALDI, Inc.*, 2020 WL 1329909, at *5 (C.D. Cal. March 20, 2020) ("For the unpaid overtime claim, Defendants used a violation rate of one hour of unpaid overtime per week. This assumption is reasonable in light of the Complaint, whose allegations lack specificity.").

48. There were approximately 818 putative class members that worked for Defendant UPS SCS during the alleged class period (July 14, 2022–present) who worked a total of approximately 112,082 workweeks. The average hourly rate across the putative class is $22.31, and thus the average overtime rate across the class is $33.47 ($22.31/hour x 1.5 hours).

49. Thus, assuming just one hour of unpaid overtime per week, a conservative estimate of the amount in controversy for Plaintiff's unpaid overtime claim is **$3,751,384.54** [$33.47 (OT rate) x 1 (hour per workweek) x 112,082 (workweeks during class period)].

50. This amount does not even include any potential unpaid minimum wages or liquidated damages, both of which Plaintiff seeks recovery of. (Compl. ¶ 42.)

51. Therefore, on Plaintiff's unpaid overtime allegations alone—which are based on reasonable and conservative estimates derived from the allegations—the amount in controversy as to this claim equals **$3,751,384.54**.

**3. Wage Statement Penalties Claim (Fifth Cause of Action)**

52. Plaintiff alleges that Defendants violated Labor Code section 226 by providing him and the putative class members with wage statements containing the following defects:

a. "Statements that fail to accurately state the amounts of gross and net wages earned as a result of not paying them all earned minimum, overtime, and/or premium wages, in violation of §§ 226(a)(1) and (a)(5)";

b. "Statements that fail to accurately state the total hours worked by the employee in the pay period, as a result of not paying them for all time worked or reporting said working time for payroll purposes, in violation of § 226(a)(2)";

c. "Statements that fail to accurately list all applicable hourly in effect and the corresponding number of hours worked at each rate earned as a result of not paying minimum, overtime, meal and rest period premium, and sick wages based on correctly calculated regular rates of pay in violation of §§ 226(a)(3) and (a)(9)."

(Compl. ¶ 47 (a)–(c).) Plaintiff further alleges that these alleged violations were "knowing and intentional." (Compl. ¶ 48.)

53. Labor Code section 226(e) provides an employee a minimum of $50.00 for the initial pay period in which a violation occurs, and $100.00 for each further pay period in which a violation occurs, up to a maximum penalty of $4,000.00 per employee. The statute of limitations for penalties under Labor Code section 226 is one year. Cal. Code. Civ. P. § 340(a).

54. Defendant UPS SCS estimates that it employed at least 569 non-exempt employees in California from July 14, 2025 (within the one-year statute of limitations). UPS SCS further estimates that the total number of pay periods for these employees during this time period is 14,758. As a result, a reasonable exposure estimate for Plaintiff's inaccurate wage statement claim is **$1,447,350** [($50 for the 569 first pay periods = $28,450) + ($100 for each of the subsequent 14,189 pay periods = $1,418,900)].

55. Courts regularly hold that a 100% violation rate is proper based on allegations to those Plaintiff makes here. *See, e.g.*, *Rivera v. Jeld-Wen, Inc.*, 2022 WL 3702934, at *6 (S.D. Cal. Feb. 4, 2022) (applying 100% violation rate and explaining "courts have instructed that wage statement claims must be assessed in the context of the other wage-and-hour violations alleged in a complaint"); *Johnson v. Parsec, Inc.*, 2022 WL 17407960, at *1 (C.D. Cal. Dec. 2, 2022) ("100% violation rate for the[] [wage statement claim] follows logically from Plaintiffs' allegations. If the meal and rest break violations regularly occurred and were typical across the class as Plaintiffs have alleged, then necessarily the vast majority, if not all, wage statements would be incorrect.").

56. These wage statement penalty calculations are more than reasonable given the sweeping allegations in the complaint. Thus the total value of Plaintiff's wage statement claim is **$1,447,350**.

**4. Waiting Time Penalties Claim (Sixth Cause of Action)**

57. Plaintiff also seeks to recover waiting time penalties under Labor Code section 203 for all unpaid wages upon termination on behalf of himself and all putative class members. (Compl. ¶¶ 52–59.)

58. Under California Labor Code section 203(a), a discharged employee is entitled to penalties of up to 30 days' pay at their regular pay, if the employee is owed but not timely paid even a single penny following the end of the employment relationship.

59. The statute of limitations for waiting time penalties under Section 203 is three years. *Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1398 (2010).

60. The three-year limitations period here runs from July 14, 2023, through the present. During this period UPS SCS estimates that the employment of at least 199 non-exempt, hourly employees ended. The average hourly rate among these terminated employees during this period was $20.86.

61. Assuming an average shift length of eight hours, a reasonable estimate of the amount in controversy for Section 203 penalties is **$996,273.60** [$20.86 (hourly rate) x 8 hours (daily shift length) x 30 days x 199 (former putative class members)].

62. The total amount in controversy for Plaintiff waiting time penalties claim is **$996,273.60.**

63. In sum, the total amount in controversy based on only four of the six causes of action, and before attorneys' fees are even considered, is **$11,196,107**. This is well beyond the $5 million threshold required under CAFA.

**5. Attorneys' Fees**

64. Plaintiff also seeks an award of attorneys' fees on all causes of action. (*See* Compl. ¶, Prayer for Relief.) In *Fritsch v. Swift Transportation Co. of Arizona, LLC*, 899 F.3d 785 (9th Cir. 2018), the Ninth Circuit concluded that "a court must include future attorneys' fees recoverable by statute or contract when assessing whether the amount-in-controversy requirement is met." *Id*. at 794; a*ccord Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) ("[W]hen a statute or contract provides for the recovery of attorneys' fees, prospective attorneys' fees must be included in the assessment of the amount in controversy," including in the context of determining CAFA jurisdiction and as a "principle[] that appl[ies] in CAFA removal cases"); *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (claims for statutory attorneys' fees are to be included in the amount in controversy, regardless of whether the award is discretionary or mandatory).

65. A reasonable estimate of fees likely recoverable may be used in calculating the amount in controversy. *See Longmire v. HMS Host USA, Inc.*, No. 12-cv-2203 AJB (DHB), 2012 WL 5928485, at *9 (S.D. Cal. Nov. 26, 2012) ("[C]ourts may take into account reasonable estimates of attorneys' fees likely to be incurred when analyzing disputes over the amount in controversy under CAFA."); *Muniz v. Pilot Travel Ctrs. LLC*, No. CIV. S-07-0325 FCD EFB, 2007 WL 1302504, at *2 (E.D. Cal. May 1, 2007) (attorneys' fees appropriately included in determining amount in controversy).

66. In the class action context, courts have found that 25 percent of the aggregate amount in controversy is a benchmark for attorneys' fees award under the "percentage of fund" calculation. Courts may depart from this benchmark when warranted. *See Campbell v. Vitran Exp., Inc.*, 471 F. App'x 646, 649 (9th Cir. 2012) (attorneys' fees appropriately included in determining amount in controversy under CAFA); *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir. 2000) ("We have also established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach.")

67. As set forth above, the minimum jurisdictional amount in controversy is easily surpassed by only a few of Plaintiff's claims. Consideration of attorneys' fees thus would only extend the degree to which the amount in controversy minimum is exceeded.

68. Under the benchmark of 25% of the total amount in controversy for Plaintiff's claims, attorneys' fees alone would be approximately **$2,799,026.75**.

### 6. Amount In Controversy Summary

69. As set forth above, Plaintiff's meal and rest break claims alone exceed $5 million. And when combined with his claims for unpaid overtime, wage statement penalties, and waiting time penalties, the total amount in controversy far exceeds the threshold required for CAFA jurisdiction:

| Claim | Amount In Controversy |
|---|---|
| Meal and Rest Break Violations | $5,001,098.84 |
| Unpaid Wages (Overtime Only) | $3,751,3858 |

| | |
|---|---|
| Wage Statement Penalties | $1,447,350 |
| Waiting Time Penalties | $996,273.60 |
| Unreimbursed Expenses | Not Calculated |
| Unfair Competition | Not Calculated |
| **Sub-Total** | **$11,196,107** |
| Attorneys' Fees (25%) (based on the above calculated claims only) | $2,799,026.75 |
| **Total (on the above calculated claims only)** | **$13,995,134** |

70. Because diversity of citizenship exists, and the amount in controversy exceeds $5,000,000, this Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2) and supplemental jurisdiction under 28 U.S.C. § 1367. This action is proper for removal to this Court pursuant to 28 U.S.C. § 1441(a).

## IV. VENUE

71. Venue lies in the United States District Court for the Central District of California, pursuant to 28 U.S.C. §§ 1391(a), 1441, and 84(c). This action originally was brought in the Superior Court of the State of California for the County of Los Angeles, which is located within the Central District of California. 28 U.S.C. § 84(c). Therefore, venue is proper because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

## V. NOTICE TO STATE COURT AND TO PLAINTIFF

72. Defendants will give prompt notice of the filing of this Notice of Removal to Plaintiff and to the Clerk of the Superior Court of the State of California for the County of Los Angeles. A true and correct copy of this Notice of Removal will be promptly served on Plaintiff and filed with the Clerk of the Superior Court of the State of California for the County of Los Angeles as required under 28 U.S.C. § 1446(d).

## VI. PRAYER FOR REMOVAL

73. WHEREFORE, Defendants pray that this civil action be removed from Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California.

DATED: August 17, 2026

SEYFARTH SHAW LLP

By: *_/s/ Kyle W. Owen_*
Phillip J. Ebsworth
Kyle W. Owen

Attorneys for Defendants
UPS SUPPLY CHAIN SOLUTIONS, INC, and UPS CARTAGE SERVICES, INC.